As a result of a mistake by me, the times for argument were not correct and they are too long. So, I'm going to ask all the lawyers to focus on their main argument because they will not have time to go through everything. So, with that, Mr. Dorsey, Sirazi case. May it please the court. There are a number of issues that are addressed in our briefs, but I'd like to highlight today for you one purely legal question that we submit warrants judgment as a matter of law in favor of the defendants, but at a minimum requires reversal and remand as to all counts raised in this case. The jury's verdict is unsupportable because it relies on an erroneous interpretation of the settlement agreement. Excuse me just a moment. The jury's verdict is unsupportable because it relies on an erroneous interpretation of the settlement agreement, the breach of which Mr. Sirazi claims was induced by GMH. When the contract is read the way it was written, Sirazi's claims, all of them, fail as a matter of law because there was no underlying breach or wrongful conduct that could be used to support a tort claim. At trial, Sirazi argued that Resco was contractually obliged to pay all proceeds from his sale of heritage shares directly to Mr. Sirazi. The district court adopted this erroneous interpretation of the contract as a matter of law in its jury instructions. Specifically, the jury was instructed. What about the conversations that Wynne of Heritage had with GMH? Yes, Judge, there were discussions that were had between Wynne and GMH. This contract interpretation issue is separate and apart from whether the knowledge of Mr. Wynne can be attributable to GMH. This is a straight contract interpretation issue that we believe raises an issue as to judgment as a matter of law based on the contract. Now, it's true that Mr. Wynne. By contract, you mean a settlement agreement? Correct, the settlement agreement that's at issue. And what Mr. Wynne, according to the testimony about that conversation, as well as the subsequent memo that was issued to GMH, discussed a security interest in heritage distributions and an amount that was owed to Mr. Sirazi. It did not discuss the fact that all proceeds had to be paid to Mr. Sirazi. And in fact, that's not what the contract says. And there was no evidence in the record that the consent requirement set forth in the contract was discussed at that meeting or in the subsequent memo with any discussions with GMH. But the damages issue in this case, which is based strictly on an interpretation of contract, which we believe the judge got wrong as a matter of law in its jury instructions, we believe mandates reversal on that point alone, regardless of what Mr. Wynne may have disclosed to GMH. Well, didn't GMH's lawyers and agents, they had the settlement agreement, they analyzed it, they reported back to GMH at GMH's direction and request? So I'm having trouble trying to see how the jury – I mean, I think it is reasonable that the jury could conclude GMH knew of Sirazi's rights and viewed the evidence in GMH's favor. Judge, we don't believe that they have met the necessary requirements for an agency relationship as it relates to Mr. Wynne. Mr. Wynne was employed by Heritage Development, which is a separate entity from GMH. He was never an agent of GMH. Well, what is the relation between Heritage and GMH? Heritage and GMH were both 50% owners of a separate company called RDD, which was the owner of the property itself. So Heritage had its own structure. GMH had its own structure. Heritage was the developer for the project, so it had the lawyer and the president who was responsible for developing the property. So they're intimately involved, the two companies. I'm sorry, Judge? They're intimately involved with each other. Agreed, Judge. They were working together to develop the property, but I don't believe that is sufficient under Illinois law to establish an agency relationship. Well, isn't that a question for the jury to decide whether or not there was an agency relationship? Because Wynne's knowledge could be imputed to GMH for purposes of analyzing the agreement and conducting the buyout, right? Agency can be a fact question.  I acknowledge. So if it's a fact question, it goes to the jury. It can, although there is Illinois law that says that the agency question can be decided as a matter of law if the elements of agency are not established. To pivot back to the discussion about the damages, though, and again, whether Mr. Wynne was an agent for GMH or not, the plaintiffs were still obliged to prove that they had damages that were established under the contract, which they allege my client induced the breach of. And so when we look at that contract, Mr. Sirazi, based on the jury instructions that were presented to the jury, was able to argue below that the sales proceeds belonged to Mr. Sirazi the moment those interests were created. But that is not what the contract says. The contract contains a waterfall provision, and that's set forth in Section 4B of the contract. Section 4B of the contract clarifies who is to be paid what and when from any heritage distributions, including cash proceeds for many sales. And Sirazi is not the first bucket in that waterfall. He's only the third bucket in that waterfall. And only after $14.25 million has been paid to third parties of Mr. Rescoe's choosing, it's only then that any potential obligation to pay Mr. Sirazi would have arisen under the terms of the contract. So but isn't debt forgiveness, can't it count as distributions? Didn't Sirazi's expert testify to that? Yeah. And you didn't really present any evidence to the contrary. Well, what we did was we argued that the contract, we argued this to the district court, we argued it in our post-trial briefs, and we argued on this appeal, that the term distribution set forth in the contract is a defined term, and it does not define to include the term debt forgiveness. Under the plain and unambiguous language of the contract, debt forgiveness does not appear in the definition of distributions. And when read in the context of Section 4B, it is clear that distributions must be paid, applied, or dispersed. There is no way to pay, apply, or to disperse debt forgiveness. It is incohate. It is not something that can be transferable. And therefore, the party's clear intent in the provision was to exclude debt forgiveness from the definition of distributions. Why? I'm sorry? Why? Because, first of all, there had to be something that was of value and transferable that would be paid. The parties chose the language distributions and excluded from it the definition of debt forgiveness because all of the things that are defined in distributions are negotiable. They're transferable. They have value to third parties. And if you look at Section 4B of the contract, all of those were individuals who would have to be paid money. One of them was Republic Bank. One of them was third-party liabilities. How should we read subsection 5 of that? Finally, 25% of the amount of such distributions to Serrazi. Yes. What does that mean? Yes. So there's the waterfall provision. And we submit that he doesn't meet the test to get paid anything. If we reach the fifth bucket. Then get paid anything? He's not entitled to be paid anything until the cash proceeds from the sale exceed $14.25 million. So that's 25% of the amount of such distributions go to Serrazi, right? Correct. Now how much were those distributions? The total cash proceeds from the sale, which we believe is what a distribution is, were $5.2 million. So you never even get past the second bucket of the waterfall. The second bucket of the waterfall says $14.25 million of proceeds must be generated before Mr. Serrazi gets a penny. But if we buy what Mr. Serrazi's expert is selling, under his calculations, the distributions total $31.8 million, which was enough to pay the 12.9 to Serrazi even under the waterfall, right? That requires a certain number of assumptions, which are false. The first is that the first Republic Bank loan, which was paid off by a new note, should be deemed to have been assigned to Mutual Bank. Even Mr. Serrazi's counsel on the stand at trial acknowledged that the Mutual Bank loan was not an assignment of the Republic Bank loan. What was it? It was a new loan that was used to, in Mr. Serrazi's own words, he signed an irrevocable standby letter to Mutual Bank stating it was a, quote, payoff of the original note by a new note. So it's a new note with separate obligations and not an amendment or an assignment under the definition of the party's agreement. Mr. Serrazi argues that the court should equitably read into the contract language something that would suggest that an assignment can mean a new note and a payoff. But that's not what the clear language of the contract says. And there's no equity that we believe should be implied here to read out of the contract a pretty clear provision, in fact, one that Mr. Goertz, Mr. Serrazi's counsel admitted on the stand, didn't come with that interpretation as to that issue. As it relates to the 25 percent question, Your Honor. So Judge Williams mentioned, what, $31 million or $37 million, whatever it was? That's correct. Versus the $5 million. So what is the $32 million between? Yes. So there's a $5.2 million cash component. There's no dispute between the parties as to what that component represents. There's $26 million of debt forgiveness, which, as, again, we've pointed out, we don't believe the contract allows to be run through the contract. But even if it were, we don't believe that there were sufficient evidence of what the value of that debt forgiveness was in the trial. Where is the debt forgiveness discussed in the contract? It is not at all. The definition of distributions does not mention debt forgiveness whatsoever. It talks about proceeds. It talks about cash. It does not, for any mention in Section 5 at all, discuss debt forgiveness. We don't believe it was the party's intent at all to contemplate that because, again, it's not negotiable. It's not something that could be used to pay off a third-party debt, which was the purpose of Section 4. If there are no further questions right now, I'd like to reserve the balance of my time. Okay. Thank you, Mr. Dorsey. Mr. Scandalia? Thank you, Your Honors. May it please the Court. At trial, we presented and proved all claims at issue in this appeal. Through the evidence and the Court's proper instructions to the jury. As you have heard, this appeal is about a contract between Mr. Shirazi and Mr. Esco. So why don't you get right to the distribution and why you think that the debt forgiveness is included in that distribution? Yes, Your Honor. Because we know what the evidence was. Yes, Your Honor. The issue of the calculation of the distribution was left to the jury to compute those damages. The facts that the jury had to make its decision about what to include or exclude from the proceeds boil down in large part to the testimony, unrebutted, of our expert, Mr. Polash, who is a CPA. And Mr. Polash explained that under generally accepted accounting principles, that loan forgiveness should be treated as a cash transfer when it's used to pay debt. It's an equivalent transaction. This was unrebutted. A reasonable jury could rely on Mr. Polash for that purpose. And in its deliberations and computation of the damages include the loan forgiveness. This issue about whether or not the contract required direct payment to Shirazi and whether it required all proceeds, I think, is a red herring. The jury was not instructed, and the plaintiffs below did not ask for all proceeds. As a matter of fact, the jury instructions make clear that the proceeds Mr. Shirazi was entitled to was up to the amount of his security interest. And his security interest is the agreed debt that was being protected in the settlement contract. Likewise, at no time did the district court instruct the jury, or did we tell the jury, that either G.M.H. or Mr. Resnick... So could you explain how those two things are identical? Yes, Your Honor. The way it would work, for example, is... If I owe you $100 and I forgive that, is that the equivalent of my receiving $100? Is that the idea? By forgiving the debt, I have... Yes, that's a related concept. I think taken a step further, Your Honor, the idea is that one can use debt forgiveness to satisfy an obligation. And if the debt forgiveness is used to satisfy an obligation, according to generally accepted accounting principles, and I witnessed, it's like using cash. It's an equivalent transaction. The point made earlier about... So then this calculation of the distributions of $31.8 million, that means then it's enough to pay off the $12.9 million of Shirazi's, right? Due to Shirazi, even under the waterfall principle. That's precisely right, Your Honor. And in fact, that is what the jury was instructed to do. The jury was instructed to decide what all the proceeds were coming in and then to offset the value of Mr. Shirazi's security interest against it. And it's more than enough to cover the security interest. And then can you talk about this $131 million that originally, you know, the shares, I think, were worth? Well, GMH paid $131 million for its prior 50% share, right? So at the time of this settlement agreement, that had been reduced significantly. What happened in the transaction is GMH, a multibillion-dollar company, purchased this property. And it's in Luxembourg and in England. And so it needed people on the ground here in Chicago to manage the development. And so Mr. Resko had a relationship with Mr. Auchi, the owner who controls GMH, and they decided to use Mr. Resko as the person on the ground here. GMH funded Heritage, paid the salaries of Mr. Rahman, paid the salaries of Mr. Nguyen, paid all of the operating expenses, paid for the office. They funded Heritage, and in all material respects, Heritage was beholden to and answered to GMH. Now, back to your point, Your Honor, on the structure of it. In order to incentivize Resko Heritage to be the eyes and ears on the ground in Chicago, they were able to get a 50% share in the property and it was paid for with the loans. The $26-plus million in loans is how Resko managed to afford or managed to acquire the interest in the property that was owned through Heritage and owned by Heritage and GMH. That's how they wound up being partners. But in a very real sense, and a reasonable jury had direct evidence of this, Heritage was there to do GMH's bidding, and Rahman, an attorney, was hired by GMH to be general counsel of Heritage and was asked for his legal analysis about the contract in connection with Auchi's decision to buy out Resko's interest. And by the time he was asked for this advice, he already had a copy of the agreement, he had already analyzed it, and he knew that a sale of Resko's interests without first getting Mr. Sirazi's consent or paying the security interest violated the agreement. The jury heard that, and the jury could reasonably infer that Mr. Nguyen, the lawyer hired by GMH as general counsel of Heritage, for this very purpose, to stay on top of issues relating to the company, relayed that back. And, in fact, very important is the October 19th conference call, which was set up for purposes of informing. The primary purpose was to inform Mr. Auchi of Mr. Sirazi's contract and how it related to what was the implication of that contract as it related to his plan to buy out the property. Nguyen was on that phone call, as was Rahman, as was Auchi, as was McDotty. And it's, I think, a very obvious inference for the jury to make, a reasonable jury to make, that the analysis he performed, certainly front and center for the purpose of the call with Auchi on it, was then related. Also, I would say on this one more point on the issue of knowledge, is I believe that one of the reasons why the jury imposed punitive damages here is because GMH repeatedly told the jury that they didn't know about this contract. They didn't know what it said. They thought they were just dealing with Resco, and there were no encumbrances. There was nobody else to worry about. The jury had exhibits admitted into evidence that were sent to McDotty that McDotty acknowledged receiving on the stand that set out the contract, that told McDotty and GMH and Auchi directly that Mr. Sirazi had a settlement agreement. I'm thinking of one of them that had the fact of the settlement agreement, its date, the fact that it granted Mr. Sirazi a security interest, and that at that time the value of that interest was $12 million. McDotty on the stand acknowledged receipt of that document. So my point was I think a reasonable jury could and was offended and very much put off by the fact that on the one hand they're being told by Mr. Auchi, the owner of the company who really directs the business. We played his video. He was deposed in London, and he said to the jury that he didn't know about this contract, and, in fact, he didn't even know who Mr. Sirazi was. Documentation to GMH about Mr. Sirazi and his security interest and its relationship to this buyout plan was in abundance. Can you speak to the cross-appeal in this indirect benefit issue? Yes. Yes, I can, Your Honor. Essentially what that boils down to is I think a very simple issue. The question is whether or not a benefit parked in a company by a person who owns 100% of that company is still a benefit to that individual. I think that's what it boils down to. But how far would you press that? You wouldn't say, would you, that if a corporation gets into trouble, has to pay a judgment and so on because it had benefited improperly, you wouldn't say that all the shareholders of the corporation would also be liable and have to pay damages, right? We don't usually. So what's special about Auchi? I agree with you, Your Honor, and here's what's special. What you need to prevent that kind of extreme outcome is you need involvement of the wrongdoer. So in other words, it's not just that he owns the company and they made this acquisition and so he's benefiting because he owns it. He was an active participant in the scheme to violate the security interest, and that's the extra piece you need if you're going to find that the indirect benefit should be attributed as part of unjust enrichment to the wrongdoer. I would also point out, and we cited in our briefs, that the restatement of unjust enrichment and restitution supports our position by saying that for an unjust enrichment claim, it's not necessary that title transfer to the property at issue. And that's what we're saying. The fact that the title of the interests that Auchi acquired was first directed to one company, which they dissolved, and then went to another company in London, that's not the relevant trail to follow. The relevant trail to follow, we would submit, is Auchi was involved in this wrongdoing. He was informed and directing this, and so because of that, when the unjust benefit is directed to his company, which he owns and controls 100% of, he enjoys that benefit. And if he parks it there for a while and gets it later, it's still a benefit that he enjoyed. And the jury returned a verdict of liability on unjust enrichment. So in terms of Illinois law, Illinois law doesn't require that the unjust enrichment be direct versus indirect, right? There's no case law for that. What about the flip? Is there any case law that says indirect is sufficient? There is, Your Honor, but indirectly. I'll tell you what I mean by that. The Illinois State Supreme Court case in HPI, it recognized an indirect benefit in the context of unjust enrichment, but I don't want you to think that it's on point with our fact pattern because it's slightly different. The difference is in HPI, the wrongdoer acquired the benefit from a third party, and what the Illinois Supreme Court said was that just because he obtained the benefit indirectly, that was still unjust enrichment. But I think one thing that the cases we cite and the law in the state does show is that there is an interest, in part because this is an equitable claim, in approaching it with a certain amount of flexibility, reflected in the restatement that it's not about title transferring. It's really about who in a real way, in a real sense, is getting the benefit and in order to charge him with unjust enrichment, also participated in the wrongdoing to obtain the benefit. If there are no other questions, I'll stop there. Okay, thank you, Mr. Scindaglia. Mr. Dorsey? I'd like to, I guess, address in rebuttal some of the points that Mr. Scindaglia raised. The first concept that we talked about was whether loan forgiveness is equivalent to debt. First of all, Mr. Polash testified on the stand that he acknowledged that debt forgiveness is not the same as cash. I don't understand that. If the person who owes the debt doesn't have the means to repay it. So, in other words, it might be a cash equivalent to forgive a person's debt who has an ability to repay it, but if that person has no ability to repay it, it is not a cash equivalent. If I forgive a million-dollar debt of somebody who is insolvent, the value of that debt forgiveness is not a million dollars. It's close to zero because there was no chance I was ever going to be repaid it. And there was no effort by the plaintiffs to try to value that debt forgiveness at trial. In a case of a person who owed... Well, I don't understand. Why would there be debt forgiveness if the debtor had no ability to pay? The debt was forgiven because GMH and Mr. Sirazi had no expectation that Mr. Resko had an ability to repay it. There's no possibility that he could recover and make money later on? He owed between GMH and... The question is, is there a possibility? I don't think so. He owed both parties $43 million and had been indicted. Then what's the point of the debt forgiveness? He gets to wipe his slate clean. I'm not saying it's without debt. If the debtor can't pay, what is the point of forgiving the debt? There's some value that the debtor can now wipe his slate clean. I don't understand. You've just said the debtor can't pay. Yes. So what is the point of forgiving the debt? If the debtor could pay anything, not having a judgment for $26 million has some value to the debtor. But that doesn't mean that it would have value to a third party. You want to go into business again, you don't have to list that as a debt. You don't have to list it as a debt. That's correct. It's a value to them, isn't it? Or if you come into $1,000, you don't have to pay that $1,000. Essentially, that's just a gift of $26 million to him then. That's what you're saying. No, I would say that it may have some value to the debtor. It has no value to third parties, and the value to the debtor is still not $26 million because he was never going to be able to repay that money. How do you know? Because he owed $43 million to Mr. Serrazi and GMH alone. Just between the two of them, he owed them that much money, and he had already been indicted at the time. But the plaintiffs didn't offer any evidence to value that debt forgiveness. First of all, I don't think that it falls within the definition of distributions under the contract. But even if it did, there was no effort to value that that would allow the jury to reasonably conclude that it had a cash equivalent value of $26 million. Did you value it? We did not, Judge, no. So how do we know what the value is? We don't. I believe there's a failure of evidence on the plaintiffs on that point. And I would like to make one point clear. First of all, the damages were across the board, the supposed value of the security interest that the plaintiffs would be paid. So this is applicable not just to the tortious interference claim, but the conspiracy and the unjust enrichment claim. And even if you were to conclude that distributions should be treated as cash, I would urge you to take a look at our waterfall calculation in the brief that we've calculated, because if you look at the calculation, Mr. Serrazi, we don't believe, even gets to that first bucket that he's a part of, which is the third bucket. Even if he gets there, he's only entitled to $4.7 million, which is significantly less than the value of the judgment. Mr. Rezko then had the ability to pay another $10.25 million to any creditor that he chose, after that first bucket was paid to Mr. Serrazi. And then we get to the fifth bucket, which we talked a little bit about before, which says that only 25% of the money that comes in from that bucket gets distributed. So even if you float all of the money through the waterfall, you'll see in our briefs that it would take over $60 million of proceeds in order for any payments to justify the verdict. That's not what 5 says. It doesn't say 25% of what's left after the first four payments. It says the amount of such distributions. Right. So 25% of any distributions that came in, in this case, if you were to conclude that would include debt forgiveness. It depends what distributions means, right? It does, Judge. But at a minimum, even if you were to acknowledge it. Why do you think distributions doesn't include debt forgiveness? Why does it not include it? Yeah. Because debt forgiveness can't be paid, applied, or dispersed, and that's the introductory sentence to paragraph 4B of the document. The introduction? Yes, section 4B, which talks about the waterfall. It's exactly how the money is supposed to be paid, applied, and dispersed. Debt forgiveness can't be, and that's why it can't flow through a waterfall. Can't be what? Debt forgiveness can't be what? Can't be paid, it can't be applied, and it can't be dispersed. Well, but you admit if the debtor could pay any part of the debt, that part, if forgiven, would be the equivalent of a cash transfer, right?  No, no. If the debtor could pay something on the debt, then forgiving the debt is the equivalent of a payment of cash to him of that amount. Perhaps from an accounting standpoint, but not in the definition of this contract, which is what governs the public's relationship. I don't see the definition of this contract. Where does it say debt forgiveness doesn't count? Section 5 defines distributions. There's nothing in Section 5 saying that debt forgiveness doesn't count. That's true, Judge, but it also doesn't say that it does. Yes, but what's the more sensible interpretation then? Well, we believe that in context of Section 4B... I mean, you talk about plain meaning. It's not plain meaning. So what is your basis for thinking distributions do not include debt forgiveness? Because Section 4B must be read in conjunction with Section 5, and debt forgiveness can't be paid, applied, or dispersed. Debt forgiveness can't be what? Paid, applied, or dispersed, which is the language used in Section 4B. Section 4B? It's the top part of the waterfall provision that governs who gets paid when. It says, shall pay, apply, and disperse such distributions? Exactly. And you say that can't be debt forgiveness? Correct, because debt forgiveness can't be paid, applied, or dispersed. That's so unreal. Because as you've agreed, if the debtor can pay, then forgiveness is the equivalent of giving him cash. It may have a value equivalent to cash to the extent that that... It's the equivalent. It's exactly the same. I owe you $1,000, you forgive me, you've given me $1,000. From an accounting standpoint, I can agree. No, from an economic standpoint, you forgive my debt, you've given me the money that I owed you. And I understand, Judge, that that is true from an accounting standpoint. I just don't think it's consistent. Right, and then you didn't put on any evidence to counteract the expert's testimony. Mr. Polash admitted on the stand that the debt forgiveness here was not cash equivalent because Mr. Resco was not money good on his debt, and they didn't attempt to value what the debt was or forgiveness. If it were sold on the market, Mr. Resco's debt of $26 million, what would it have generated? The plaintiffs were free to put on that evidence. They didn't try at all. And so we believe there's a failure of proof as to that element of their claim. So the fact that he benefited by the $26 million is irrelevant? Again, yes, because it can't be paid, applied, or dispersed to a third party to pay off those other debts. Okay, well, thank you, Mr. Dorsey and Mr. Scindaglio. We'll move on to our next case, Hextra v. Ford.